CANTON ROLL & MACHINE CO. et al. v. ROLLING MILL CO. OF AMER-
ICA et al. STURGISS et al. v. CORBIN et al. FARMERS' DEPOSIT
NAT. BANK OF PITTSBURGH, PA., et al. v. LOGAN et al.

(Circuit Court of Appeals, Fourth Circuit. January 12, 1909.)

Nos. 780, 762, 781.

1. MECHANICS' LIENS (§ 32*)—RIGHT TO LIEN UNDER WEST VIRGINIA STATUTE—
MACHINERY FOR MILL.

Code W. Va. 1906, § 3111, which gives the right to a mechanic's lien to
any person "who shall * * * furnish any material or machinery for
constructing * * * any mill, manufactory, * * * or other struc-
ture," gives a lien for machinery furnished as a necessary part of the
equipment of a mill, although it is not intended to be permanently attach-
ed to the freehold; and such lien covers the price of spare rolls furnished
with a tin plate mill, and shown to be an essential part of the equipment
of such a mill.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. § 37; Dec.
Dig. § 32.*]

2. MECHANICS' LIENS (§ 132*)—MACHINERY—TIME FOR FILING CLAIM—COMPLE-
TION OF CONTRACT.

Complainant contracted with a tin plate company to furnish machinery
for the equipment of a new tin plate mill, for which it was entitled under
the statute to a mechanic's lien if filed within 60 days after it ceased to
furnish the machinery. The contract included a number of extra rolls to
be delivered with the other machinery, which were made at about the
same time; but on request of the purchaser to withhold shipment until
further notice, some of them were not shipped. *Held*, that complainant
had the right to ship them a year later without further orders, and to
file its statement for a lien for the price of the entire machinery within
60 days thereafter.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. §§ 190-
207; Dec. Dig. § 132.*]

3. MECHANICS' LIENS (§ 159*)—RIGHT TO LIEN—EFFECT OF FILING CLAIM—
ESTOPPEL.

The filing of a claim for a mechanic's lien which is afterward abandoned
does not estop the claimant to file another including the same indebted-
ness, where the second claim is filed within the time allowed by the
statute.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. §§ 188, 189;
Dec. Dig. § 159.*]

4. CORPORATIONS (§ 312*)—OFFICERS—RIGHTS AS PURCHASERS OF BONDS OF
CORPORATION.

The president of a corporation pledged $100,000 of its bonds to secure
a loan of $21,500 obtained for it from a trust company of which he was
also an officer. After demand for payment and his statement that the
corporation could not pay, on short notice which the president did not
communicate to some of the directors, the bonds were sold at auction.
The president sent the secretary, who was also a director and attorney
for the corporation, to the sale, and by his direction the bonds were
bought by a broker, in the name of a former president and director, for
$22,500, and were charged by the broker to his account and delivered to
him. Two years afterward, when the corporation had become a bank-
rupt, a brother of the nominal purchaser of the bonds appeared and claim-
ed to be the owner and to have been the real purchaser. The secretary
testified that he acted for claimant at the sale, and that he had a joint in-
terest in the purchase. There was other evidence strongly tending to show
that the purchase was in fact made for the secretary, the president, and

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
168 F.—30

certain other directors of the corporation. *Held* that. even conceding claimant to have been the purchaser, he was affected by the fiduciary relation in ·which his partner in the purchase stood to the corporation, and that neither could derive any benefit from the purchase at the expense of the corporation, but could at most recover only the amount paid with interest.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1383–1391; Dec. Dig. § 312.*]

Appeal from the Circuit Court of the United States for the Northern District of West Virginia, at Parkersburg.

Petition for Revision of Proceedings of the District Court of the United States for the Northern District of West Virginia, at Parkersburg.

Appeal from the District Court of the United States for the Northern District of West Virginia, at Parkersburg.

For opinion below, see 155 Fed. 321.

The three above-entitled causes were, by consent of parties, heard together in this court, as they all relate to the same subject-matter, that is to say, the property and estate of the Morgantown Tin Plate Company, bankrupt, and involve the questions of how and to whom the same shall be distributed. The last-named cause, No. 781, is an appeal from a decree of the United States District Court entered on the 23d day of August, 1907, in the bankruptcy cause proper, decreeing payment to one Frank J. Logan of the sum of $100,000, with interest at 6 per cent. per annum from the 1st day of January, 1903, being in full of 200 first mortgage bonds of the par value of $500 each of the bankrupt, claimed to be owned by said Logan. The second cause, No. 762, is a petition asking for the supervision and revision by this court, in matter of law, of the decree entered in the bankruptcy cause in favor of Frank J. Logan; and the first-named cause, No. 780, is an appeal from a decree of the United States Circuit Court in equity, entered on the 23d day of August, 1907, dismissing complainant's bill.

In the equity cause, the complainant, the Canton Roll & Machine Company, sought to enforce a certain mechanic's lien against the Rolling Mill Company of America, and the bankrupt, the Morgantown Tin Plate Company (successor to the Rolling Mill Company of America), for an indebtedness of $14,889.98, with interest from the 23d day of March, 1904; and the same was instituted upon the theory that the assets of the Rolling Mill Company of America had been collusively absorbed by the owners and officers of the Morgantown Tin Plate Company, in derogation of the rights of the creditors of the Rolling Mill Company of America, and that said Morgantown Tin Plate Company had incumbered its own property, and the property and estate acquired by it from the Rolling Mill Company of America, by a mortgage for $150,000, and that $100,000 of the bonds (being the same bonds referred to in the bankruptcy decree appealed from) had been hypothecated for a debt of $21,500, and subsequently, upon sale of the collateral, that the bonds had been acquired by some unknown person in the interest of certain officers and directors of the Morgantown Tin Plate Company, all of which was charged to be in fraud of the rights of the complainant and other creditors alike of the Rolling Mill Company of America and said Morgantown Tin Plate Company.

Although this suit in equity was filed on the 20th day of June, 1904, some two months or more after the adjudication in bankruptcy of the Morgantown Tin Plate Company, the contests over the indebtedness of the Morgantown Tin Plate Company, especially as to the debt due the Canton Rolling Mill Company, the plaintiff in the equity suit, and the amount due by reason of the sale of the hypothecated bonds as aforesaid, seems, without objection, to have been litigated in the equity cause, in which the bankrupt's trustee interposed,. and joined particularly in the contest respecting the ownership of the bonds, and the right of the holder of the same to recover more than the amount for

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

which they were hypothecated. At a later date, the Farmers' Deposit National Bank of Pittsburgh, Pa., and George C. Sturgiss intervened in the same cause, by petition, also attacking the validity of the sale of the bonds so deposited as collateral, and asked to be allowed to set up certain claims held by the bank as assignee of said Sturgiss, including that of the Canton Roll & Machine Company, the complainant aforesaid. The contest was an unusually bitter one, as appears alike from the proceedings in bankruptcy, and the equity case aforesaid, and resulted in the Circuit Court entering the decree appealed from, which is as follows:

"This cause having come on for final hearing and decision at the May term of this court, and having been duly argued and submitted by counsel, and this court having carefully considered all the pleadings, evidence, and exhibits heretofore taken and filed herein, and orders and decrees heretofore made, together with the briefs of counsel for the respective parties, and having on the 2d day of August, 1907, rendered and filed its opinion in writing upon the controversies submitted to it, which is now incorporated in and made part of this decree, this court doth now declare, order, adjudge, and decree that the bill of the plaintiff in the above-entitled action and of the interveners therein, to wit, the Farmers' Deposit National Bank and George C. Sturgiss, is insufficient in law and must be and is hereby dismissed upon the merits, and that the defendants in this action and each of them, to wit, Rolling Mill Company of America, Morgantown Tin Plate Company, Hector M. Hitchings, Melvin J. Palliser, W. J. Logan, Jacob Meurer, Dick S. Ramsey, and Andrew Meurer, recover of the plaintiff and the petitioners in this action their costs in that behalf sustained, to be taxed by the clerk of this court; and it is further ordered, adjudged, and decreed that a duly authenticated copy of this judgment and decree be remitted by the clerk of this court to the clerk of the United States District Court for the Northern District of West Virginia for the appropriate consideration and action of that court.

"And all the pleadings, proceedings, depositions, exhibits and evidence, and orders in this cause are hereby remitted to the aforesaid District Court for the consideration and appropriate action of the District Judge in the decision of a petition now pending in said court for the payment over to Frank J. Logan out of the funds received from a sale in bankruptcy of the assets and property of Morgantown Tin Plate Company of the sum of $100, and interest." (Entered 23d August, 1907.)

On the same day of the entry of this decree in the Circuit Court, the decree appealed from was entered in the bankruptcy cause, in favor of Frank J. Logan, the alleged holder of the 200 bonds of $500 each as aforesaid, pursuant to his petition in such bankruptcy proceedings filed on the 24th day of September, 1906, in which he claimed to own said bonds, and which decree in favor of Logan for the face value of the bonds and interest was based upon the above decree entered by the Circuit Court, together with the pleadings, exhibits, and testimony taken in said cause, as contemplated by the order of the Circuit Court dismissing the cause as hereinbefore recited. The decision of the lower court is found in 155 Fed. 321, to which reference is made for a full statement of the facts in these causes.

B. M. Ambler and A. Leo Weil (C. M. Thorp, on the brief), for appellants.

Hector M. Hitchings, for appellees.

Before PRITCHARD, Circuit Judge, and WADDILL and McDOWELL, District Judges.

WADDILL, District Judge (after stating the facts as above). A number of assignments of error are presented for the consideration of the court, but they may be reduced substantially to three propositions: (1) The correctness of the order of the court dismissing the bill as to the complainant, the Canton Roll & Machine Company. (2) In dismissing the bill and awarding costs in favor of the defendants

named in the decree against the complainant; and subsequently, up-on the decree of the Circuit Court, and the pleadings and testimony taken therein, ordering in the bankruptcy cause the payment to Frank J. Logan of $100,000, with interest and costs. (3) In dismissing the petition of the Farmers' Deposit National Bank and George C. Sturgiss in said Circuit Court.

We will consider the questions presented in the order named, and remark in passing that in the view we take of the cause, assuming that the decree of dismissal by the Circuit Court should have been entered at all, it should have been without prejudice to the several parties to seek relief in some other appropriate action if the same could not be afforded them in the equity cause.

1. While the point as to the validity of complainant's mechanic's lien which was subsequently assigned to Sturgiss is admittedly a nice one, we find ourselves, after the most careful consideration that we have been able to give to the question, unable to agree with the trial court as to the invalidity of the lien. The seventh and thirteenth paragraphs of the bill read:

"Among other contracts so made, said Rolling Mill Company of America entered into a written contract with your orator on December 5, 1901, for the purchase from your orator of six hot tin mills, complete, six stands of cold mills, complete, and certain other machinery and appliances, for which the said Rolling Mill Company of America agreed to pay your orator the sum of $35,000; a copy of said contract being hereto attached, marked 'Exhibit A.' Your orator has fully performed said contract by furnishing said mills, rolls, and machinery in accordance therewith, said machinery and materials having been furnished for and about the construction of said mill and manufactory, and the buildings, appurtenances, and fixtures therewith connected, and said rolls, machinery, and material thereby became, and have since been, and now are a part of said tin plate plant and property. The said Rolling Mill Company of America has paid or caused to be paid to your orator a portion of the said contract price for said machinery and materials, but has failed to pay the remainder thereof. to wit, the sum of $14,889.98, which amount, with interest thereon from March 23, 1904, is due and payable to your orator on account of said contract, and the furnishing of said machinery and materials. Your orator has frequently demanded payment of said sum of $14,889.98, but hitherto the said Rolling Mill Company of America has failed and neglected to pay the same; and the whole amount thereof, together with interest thereon as aforesaid, is now due and payable to your orator without any set-off or abatement whatever."

"Your orator is entitled to and has filed a mechanic's lien for all its said claim of $14,889.98, with interest as aforesaid, against said real estate and manufacturing plant, in accordance with the laws of the state of West Virginia, and claims and is entitled by virtue thereof to a lien on said property."

The contract of December 5, 1901, between the Rolling Mill Company of America and the Canton Company, included, as part of the machinery to be furnished for the lump sum of $35,000, 24 chilled rolls. Under the head of "miscellaneous" the Canton Company agreed also to furnish 24 additional rolls—"six pairs to be delivered with the mills, balance when required at Association prices f. o. b. Canton, Ohio, terms 30 days, net." Of the 24 additional rolls (described in the invoices and mechanic's liens as "extra rolls"), 2 were shipped on January 29, 1903, 1 on March 19, 1903, and 9 on February 22, 1904. The remaining 12 were never required or shipped.

Concerning the nature and use of the extra or spare rolls, the testimony of Humbert and Loyd is to the effect that a set of spare rolls is as necessary a part of the equipment of hot tin mills as is the original set of rolls. Neither the original nor the extra rolls were ever intended to become affixed permanently to the freehold. The West Virginia statute (section 3111, Code 1906), reads:

"Every mechanic " * * or other person who shall * * * furnish any material or machinery for constructing * * * any mill, manufactory * * * or other structure * * * shall have a lien * * *."

While this statute, as we read it, does not give a lien to the person furnishing tools, it does give a lien for machinery used in the construction of a mill or factory. The spare rolls, when put in use, would be integral parts of the heavy "mills," and, as such, as much machinery used in the construction of the factory as would the first or original set of rolls.

The filing of the mechanic's lien on June 25, 1903, which was abandoned, does not vitiate the lien filed February 24, 1904, if the latter was filed within 60 days after the lienor had "ceased to furnish machinery." Section 3113, Code 1906. The facts as to the shipment on February 22, 1904, of the last 9 of the 12 extra rolls, which were to have been delivered with the mills, are as follows: On January 31, 1903, the Morgantown Tin Plate Company wrote to the Canton Company:

"We do not desire any of the spare rolls shipped in until after all the other material is received. * * *"

And again on March 18, 1903:

"Do not make or ship any spare rolls for our account until further notice. We * * * have no room for these at present is our reason for requesting delay. We will notify you soon as can take them."

On March 28, 1903, the Canton Company wrote:

"Rolling Mill Company of America, Morgantown, West Va.

"Gentlemen: We received several days since your letter requesting us not to ship any more of the extra rolls at this time, and the letter was received just in time to head off a shipment. We had ordered in a car for the rolls covered in the enclosed invoice. We will hold the rolls temporarily for your accommodation."

As these spare rolls, which should not be confused with the six pairs to be delivered "when required," were a part of the machinery embraced in the original contract, were made prior to March 28, 1903 but withheld on the express request of the vendee, we do not perceive any good reason why the Canton Company could not preserve its right of lien by delaying shipment at the request of the tin plate company, and could not finally ship without an order to such effect.

We are therefore of opinion that the decree of the trial court should be so modified as to decree to Sturgiss and the Farmers' Bank, assignees of the claim, a lien, prior to that of the bondholders, for the amount of the claim originally asserted by the Canton Company. Cushwa v. Association, 45 W. Va. 490, 32 S. E. 259.

2. This brings us to the consideration of the correctness of the two decrees of the lower court, appealed from, respecting the bonds of the

bankrupt company hypothecated for the indebtedness due by it, and subsequently alleged to have been sold to and purchased by the appellee Frank J. Logan. A brief review of the facts connected with this transaction will be found necessary to its intelligent consideration.

The Morgantown Tin Plate Company, successor to the Rolling Mill Company of America, was organized under the laws of West Virginia in December, 1903, with W. J. Logan, Hector M. Hitchings, Jacob Meurer, Dick S. Ramsey, and M. G. Palliser as its officers and directors; that George C. Sturgiss and George J. Humbert were the active representatives of said company, at Morgantown, W. Va., and W. J. Logan, Jacob Meurer, Dick S. Ramsey, Melvin G. Palliser, and H. M. Hitchings (the two last named being members of the law firm of Hitchings & Palliser, attorneys for the company) were the New York representatives, the said W. J. Logan being president, and Palliser secretary, of the company. That it was contemplated that the plant could be established upon an expenditure of something like $200,000, which estimate, however, proved to be inadequate, and other moneys had to be raised before it could be made a going concern. The New York representatives and their associates put in the sum of $100,000 taking stock therefor, before the consolidation of the two companies; Humbert, $10,000; and Sturgiss put into the reorganized company $20,000 in money, donated real estate supposed to be worth some $20,000, and paid for $50,000 of first mortgage bonds at par; and it was later found necessary to raise other sums to complete the plant, and the New York directors, Logan, Meurer, and Ramsey, advanced $7,500; and, still needing money, in May, 1903, Jacob Meurer, being at the dates of contracting the loans president and vice president thereof, effected a loan through a trust company in Brooklyn, of which he was also an officer, for $21,500, being the aggregate of three several sums secured by him on May 2d, May 26th, and August 2d, and hypothecated with the trust company bonds of the Morgantown Tin Plate Company for $100,000, he also becoming personally responsible to the trust company from which the money was borrowed for the indebtedness. This money was likewise used in the effort to finish the plant, which as a matter of fact was never completed. Prior to and about the time of the borrowing of this money, the financial outlook of the company was not bright, and what had been hoped at first to be a most successful enterprise seemed to have proven a failure, and the parties apparently became demoralized; and on the 17th of June, W. J. Logan, as president and a director, tendered his resignation, and Dick S. Ramsey, another director, resigned, and L. W. Thompson (an employé in the office of Hitchings & Palliser) was named as a director in place of Ramsey, and took part in the meeting, and August Cahula was elected a director in place of Logan, but it does not appear whether he accepted the position or not. Dissensions quickly arose; Sturgiss and Humbert taking one view, and the New York parties in interest another. Suits were instituted against the company, and finally bankruptcy proceedings, in which the property was sold, and brought unexpectedly, because, it is alleged, of an agreement between Sturgiss and what is familiarly known as the "Tin Plate Trust," some $200,000, which was considerably more than it was believed to be worth, and more than

enough to pay its entire indebtedness, upon the assumption that the liability by reason of the hypothecation of the bonds would only be for the amount received by the company on its loan. The contest as to the bona fides of the sale and transfer of these bonds, and whether or not Frank J. Logan is or not a bona fide holder for value, is the great point in issue. The payment of the $100,000 of bonds, with interest, as claimed by him, will not leave enough to pay even the lien debts of the company; but by refunding him what he is alleged to have paid for them with interest, there will be ample funds to pay all creditors, and a surplus to the company.

The facts concerning this transaction respecting the sale of the hypothecated bonds are rather unique. After Meurer negotiated the loan with his trust company in the spring of 1903, the same was allowed to run until the 16th of October, 1903, on which day the trust company wrote Meurer demanding payment of the $21,500 on Monday, October 19th, before 12 o'clock. On October 17th, having received a communication from Meurer also dated the 16th, stating the inability to comply with the demand for payment of the $21,500 by Monday, the 19th, at noon, the trust company wrote him that they would cause to be sold at public auction, at the office of Adrian H. Muller & Son, No. 55 William Street, New York City, the 200 first mortgage bonds of the defendant company, and that advertisement would be made of such sale on Monday, the 19th instant, and the bonds sold on Wednesday, the 21st instant. Notice of this proposed sale was published in two New York newspapers, and the bonds were duly exposed for sale on the day and at the place mentioned, and one George J. Weedon, a representative of the firm of R. J. Kimball & Co., purchased the $100,000 of bonds at 22½ cents on the dollar, which purchase, he says, he made upon the order of M. G. Palliser, on account of W. J. Logan, to whose account they were charged, and taken credit for with him in current settlement; and the said W. J. Logan, subsequently, to wit, on the 7th day of January, 1904, gave to said firm of R. J. Kimball & Co. his receipt for the bonds in his own handwriting, and the same were delivered to him. The said Weedon testified further that Frank J. Logan had dealings in the account of W. J. Logan, and that he represented W. J. Logan when the latter was abroad, and that what he meant by Frank J. Logan "having dealings in account with W. J. Logan" was that he had a power of attorney to act for the latter, and occasionally so acted. The $22,500 thus received from the sale of these bonds was accounted for to the trust company, and the notes of the Morgantown Tin Plate Company duly taken up, and an account by the trust company to Meurer for the Morgantown Tin Plate Company duly rendered, with check for $190.36, the balance; and this check was thereupon turned over by Meurer to Palliser, who was then attorney for, and a director and secretary of, the Morgantown Tin Plate Company, and he gave credit, as he claims, for the $190.36 on his firm's account against the Morgantown Tin Plate Company, and, on October 28th following, he wrote the company at Morgantown of what had occurred, and requested that proper entries be made on the company's books with a view of having the transaction clear.

Upon receipt of the notice of this proposed sale by Meurer, president,

from the trust company, the New York parties in interest were duly advised, but no information was given to those at Morgantown to be affected thereby. No meeting of the directors was called, nor any step taken to raise the money or secure delay of the sale, and no advice whatever was given to the parties in interest at Morgantown of the sale. Nor was the notice as published in the newspapers of sufficient length of time to advise them of what was to be done, and they had no knowledge thereof. Promptly after this alleged sale, the parties in interest at Morgantown used their best efforts to get the facts concerning the same, and to ascertain the name of the purchaser, and were given but scant assistance by those connected with the company in New York, and denied all information as to the name of the purchaser.

Shortly after the sale of these bonds, to wit, on the 7th day of January, 1904, and before the plant had sold at the high figure aforesaid, Sturgiss and Humbert, the Morgantown managers and parties in interest, proceeded to New York to see if the stock and bonds of the company could be acquired; and Sturgiss procured from Palliser an option upon $75,000, part of the bonds of $100,000 alleged to have been sold, and 825 shares of the stock of the company, at the price of $30,000, $22,500 of which it was claimed by Palliser was to reimburse the purchaser of the bonds the amount paid therefor, and $7,500 to refund to W. J. Logan, Jacob Meurer, and Dick S. Ramsey, the three directors of the company who had advanced $7,500 to the company as aforesaid. One thousand dollars was paid on this transaction by Sturgiss to Palliser. The option was never taken up by Sturgiss, and the matter ended there, and upon his examination Palliser refused to say on account of whom, if any one, other than himself, he held the $1,000.

The bill filed in the equity suit under consideration in the Circuit Court on the 23d day of June, 1904, especially assailed the sale of the bonds placed as collateral for the $21,500 loan, and to this bill the said Jacob Meurer, Hector M. Hitchings, Melvin G. Palliser, Dick S. Ramsey, W. J. Logan, and others, on the 4th day of November, 1904, filed their joint answer, in which they studiously avoided giving the name of the alleged purchaser of said bonds, and sought to maintain ownership of the same in the hands of some unknown bona fide holder. Notwithstanding the fact that the ownership and bona fides of the acquisition of the title to the bonds was being, and had been, controverted virtually from the time of the alleged sale, the name of no purchaser was ever given until the 22d of December, 1904, when, in connection with the contest over the sale of the bankrupt's property in the bankruptcy proceedings, it appeared that one A. K. Bolan, of the city of New York, claimed to be the purchaser, and the recitals of the decree of the bankrupt court entered on the 3d day of January, 1905, show that he duly appeared by the same counsel as that of the other New York parties to oppose the sale. Promptly after receiving the name of the alleged purchaser, by direction of the referee in bankruptcy, the trustee in bankruptcy of the Morgantown Tin Plate Company, Frank P. Corbin, proceeded to New York with the view of seeing him in connection with the transaction, when he had an interview on the subject with Palliser, and attempted to see Bolan, but the

latter avoided him, and would not see him without knowing his business, and upon receiving the information, after calling several times, Corbin found a note, informing him that anything in relation to the purchase of the bonds would have to be taken up with Mr. Palliser, of Hitchings & Palliser, and that Bolan refused to see him. On the 27th of the same month, Palliser wrote Sturgiss complaining of the action of the trustee in bankruptcy in seeking an interview with his client, and stating that he did not like his attitude of attempting to talk with his client behind his back.

The appearance of Bolan, as shown by the decree of 3d of January, 1905, and the ineffectual efforts of the bankrupt's trustee to see him, as stated, and the letter to Sturgiss of the 27th of January, from Palliser, complaining of the effort to see Bolan by the bankrupt's trustee, seems to have been his only connection with this transaction, and, on the 27th of June following, he died; and the next person brought forward as the alleged owner of the bonds, as shown by the deposition of Palliser, taken on the 27th day of December, 1905, is Frank J. Logan, and he then, for the first time, is known in connection with the matter. Subsequently, on the 27th of September, 1906, some nine months thereafter, he, Logan, presented his petition in the bankruptcy proceedings, setting up his claim to the bonds, and this petition is his first and only appearance in the entire proceeding. Though he appeared then for the first time as the owner of the bonds, the title, ownership, and honest acquisition of which had been in dispute certainly since June, 1904, more than two years previously, and another person had already claimed and asserted ownership thereof, and shortly theretofore had died, he did not himself go upon the witness stand, or offer in any way to prove his ownership of the bonds or the bona fides of his acquisition of the same, or his ability to make such purchase, but contented himself to rest upon the testimony taken in the chancery cause in the Circuit Court to maintain his claim; and that, too, in the light of the fact that the testimony on which his claim to the bonds mainly rested was that of Melvin G. Palliser, a director, counsel for, and secretary of the Morgantown Tin Plate Company, and in whose law firm's office the Morgantown Tin Plate Company's office was maintained in the city of New York, who testified that the purchase of these bonds was first brought to the attention of Frank Logan by him, and that they were purchased at public sale in Palliser's presence, and by his direction, on account of said Logan, through Mr. Weedon, a member of the firm of Kimball & Co., with the understanding that he, Palliser, was to share in the profits in the transaction, and that, as shown by the testimony of Weedon, they were purchased at a lower figure than he had been authorized by Palliser to bid for them; and notwithstanding the further fact that it appeared from the testimony of Weedon that the bonds in question were bought by him under said Palliser's direction, that they were paid for out of W. J. Logan's funds, and charged to the account of said W. J. Logan, who had shortly before been an officer and director of the company; and that he, the said W. J. Logan, subsequently regularly receipted for the bonds individually, and turned them over to Palliser, who gave the option on them in

connection with certain stock, as he claims, and out of the proceeds of the money arising from the option, W. J. Logan, Jacob Meurer, and Dick S. Ramsey were each to receive $2,500. Palliser's explanation of the acquisition of the bonds by Logan, his interest in the transaction, and his effort to show Bolan's connection therewith after his death, is in substance that the representative of the firm of Kimball & Co., brokers, by his direction and upon his advice, bought in these bonds on account of Frank J. Logan; that Frank J. Logan was a client of his (Palliser's) and also of said Kimball & Co., and that no one had an interest in the transaction other than himself and Logan; and that he had an interest if they succeeded in making some money out of it at any time; and he admitted that, in explanation of the transaction of the retention of $25,000 of the bonds from the option on the $75,000 given Sturgiss, they were to be divided as a profit in the business; and in answer to the question of why the name of Frank J. Logan as owner of the bonds had been withheld until his deposition of 1905, and six months after Bolan had died, said there was no necessity or call for stating it earlier; and he explained that Bolan, who had prior to the time of his death claimed the bonds, had, and still did not have, an interest in them, his story being that Frank J. Logan, who had purchased the bonds on his advise, seeing that the matter was to be complicated for some time, became dissatisfied, and asked him to arrange to get somebody to take the bonds off his hands; that he so arranged with Bolan to take care of the bonds, but the plan was never carried out; but that Bolan had an agreement to take the bonds, and was to take them and stand in with him (Palliser) on them, but he never did. Palliser further explained that Frank J. Logan put in his money, and he, Palliser, his knowledge, time, and ability in handling the transaction, and services as attorney, against the money they hoped to realize.

The law applicable to this transaction is well settled. The officers and directors of the bankrupt company occupied and acted in a fiduciary relation in the matter of the sale of the collateral deposited by them to raise money for their corporation before its insolvency and bankruptcy; and any sale whereby they, or any or either of them, became interested in the purchase of such securities, to be valid, must at least have been in all respects free and clear from any fraud and taint of suspicion or wrongdoing or unfair dealing on their part.

In Twin Lick Oil Co. v. Marbury, 91 U. S. 588, 589, 23 L. Ed. 328, Mr. Justice Miller, speaking for the Supreme Court, said:

"That a director of a joint-stock corporation occupies one of those fiduciary relations where his dealings with the subject-matter of his trust or agency, and with the beneficiary or party whose interest is confided to his care, is viewed with jealousy by the courts, and may be set aside on slight grounds, is a doctrine founded on the soundest morality, and which has received the clearest recognition in this court and in others. Koehler v. Black River Falls Iron Co., 2 Black, 715, 17 L. Ed. 339; Drury v. Milwaukee & Superior R. Co., 7 Wall. 299, 19 L. Ed. 40; Luxemburg R. R. Co. v. Paquay, 25 Beav. 586; Cumberland Co. v. Sherman, 30 Barb. (N. Y.) 553; Hoffman Steam Coal Co. v. Cumberland Coal & Iron Co., 16 Md. 456, 77 Am. Dec. 311. The general doctrine, however, in regard to contracts of this class is, not that they are absolutely void, but that they are voidable at the election of the pary whose interest has been so represented by the party claiming under it. We say, this

is the general rule; for there may be cases where such contracts would be void ab initio; as when an agent to sell buys of himself, and by his power of attorney conveys to himself that which he was authorized to sell. * * * It is very true that as a stockholder, in making a contract of any kind with the corporation of which he is a member, is in some sense dealing with a creature of which he is a part, and holds a common interest with the other stockholders, who, with him, constitute the whole of that artificial entity, he is properly held to a larger measure of candor and good faith than if he were not a stockholder. So, when the lender is a director, charged, with others, with the control and management of the affairs of the corporation, representing in this regard the aggregated interest of all the stockholders, his obligation, if he becomes a party to a contract with the company, to candor and fair dealing, is increased in the precise degree that his representative character has given him power and control derived from the confidence reposed in him by the stockholders who appointed him their agent. If he should be a sole director, or one of a smaller number vested with certain powers, this obligation would be still stronger, and his acts subject to more severe scrutiny, and their validity determined by more rigid principles of morality, and freedom from motives of selfishness."

In Clark and Marshall on Private Corporations, vol. 3, § 763, it is said:

"The directors and other managing officers of a corporation are under a duty to the corporation and the other stockholders to prevent the property of the corporation from being sold under execution, or for taxes, or on foreclosure, etc., or, if they cannot prevent the sale, to do what they can to have it sell at the highest possible price, and, if they bring about such a sale, not under any right acquired by contract with the corporation, but in violation of their trust, and purchase the property themselves, or if, although the sale is brought about by a creditor, they purchase the same otherwise than in the most perfect good faith, all of the courts undoubtedly agree that the corporation is entitled to have the sale set aside, or hold them as trustees, or to compel them to account for profits made, or pay the fair value of the property."

See, also, Thompson on Corporations, §§ 4063, 4071, 4072; Cumberland Coal Co. v. Sherman, 30 Barb. (N. Y.) 553; Wilkinson v. Bauerle, 41 N. J. Eq. 635, 7 Atl. 514; Hope v. Salt Co., 25 W. Va. 789, 802, 808; Jones, Ex'r, v. Clark et al., 25 Grat. (Va.) 612; Addison, etc., v. Lewis, etc., 75 Va. 701, 720, 721; Cook v. Sherman (C. C.) 20 Fed. 167, and note.

In this case, whether the purchase of the bonds was made for W. J. Logan individually, or on behalf of himself and his co-stockholders and directors, or for Frank J. Logan, as claimed, is immaterial from a legal standpoint, as in either event Palliser, a stockholder, a director, the secretary of and the attorney for the bankrupt company, spoke and acted for the company, and was also the representative and attorney in the purchase of the bonds, and he admits that he was jointly interested in the profits arising from the venture with Frank J. Logan, whom he now says was the purchaser. Moreover, Meurer, the president of the bankrupt company, sent Palliser to the sale, and the latter directed Weedon, the stockbroker, to buy the bonds in, and authorized him to bid more than he, in his presence secured the bonds for. Palliser was thus the company's representative, the purchaser's representative, and jointly interested in the acquisition of the property sold. The fact that Palliser succeeded in acquiring an interest in the bonds through a third person, assuming Frank J. Logan

to be the purchaser, will not serve to relieve him, Palliser, from his fiduciary obligation, or validate his acts. Nor will the innocence of Frank J. Logan, if such was the fact, in a transaction of this character, protect him, and enable him to derive the benefit thereof, as the knowledge of Palliser, through whom he acted, will be imputed to him.

In Michoud v. Girod, 4 How. 503, 11 L. Ed. 1076, two executors combined to purchase, and through an agent employed by them, did purchase, the property of the testator. The sale was held fraudulent and void, under the civil law, the common law, and the general jurisprudence of the nation. The court dwells at pages 559, 560, of 4 How. (11 L. Ed. 1076), on the device of using another's name for the accomplishment of the sale, showing (page 560 of 4 How. [11 L. Ed. 1076]) that it was known and denounced, before our language was spoken, as a purchase "fraudulent and void, from having been made per interpositam personam." "Where once a fraud has been committed, not only is the person who committed the fraud precluded from deriving any benefit from it, but every innocent person is so likewise, unless he has innocently acquired a subsequent interest; for a third person by seeking to derive any benefit from such a transaction, or to retain any benefit resulting, becomes particeps criminis, however innocent of the fraud in the beginning." Perry on Trusts, § 172. "So property obtained by one through the fraudulent practices of a third person will be held under a constructive trust for the person defrauded, though the person receiving the property is innocent of collusion. If such person accepts the property, he adopts the means by which it was procured, or, as Lord Chief Justice Wilmot said: 'Let the hand receiving the gift be ever so chaste, yet if it comes through a polluted channel, the obligation of restitution will follow it.'" Perry on Trusts, supra, § 211; Hill on Trustees (4th Am. Ed.) p. 163; Coles v. Trecothick, 9 Ves. 234; Brooks v. Martin, 2 Wall. 70, 84, 85, 17 L. Ed. 732; Bailey v. Teakle, 2 Brock. 51, 54, Fed. Cas. No. 13,811; Newcomb v. Brooks, 16 W. Va. 32, 62; Reilley v. Oglebay, 25 W. Va. 36, 43; Lamb v. Pannell, 28 W. Va. 665, 666; Sweeney v. Grape Sugar Co., 30 W. Va. 443, 4 S. E. 431, 8 Am. St. Rep. 88.

After the most careful consideration, we find ourselves unable, from any viewpoint that we can take of the transaction respecting the sale of these bonds, to hold the same other than as fraudulent and void, except as to the money advanced in payment at the time of sale. According to the most favorable view that can be taken in behalf of Frank J. Logan, he was the joint purchaser with Palliser, who at the time was the representative in three fiduciary capacities of the Morgantown Tin Plate Company, and he thus participated in the devastavit of the assets and effects of this then insolvent and defunct concern, and he ought not, and should not in equity and good conscience, be allowed to receive anything more than the return of the money actually paid out, with interest—if, indeed, he should receive that. The testimony strongly tends to support the contention that this purchase was made by Palliser, in the interest of the New

York parties, especially W. J. Logan, Jacob Meurer, Dick S. Ramsey, H. M. Hitchings and Palliser himself. The fact that the purchase of the bonds was made on account of W. J. Logan, the same regularly charged in his account, and paid for by him, and the bonds subsequently delivered to him, and his personal receipt taken therefor, and that he was interested in the option later given by Palliser on the bonds, coupled with the haste of the sale, the failure to advise all parties in interest of the same, the general secrecy in connection with the transaction, the delay in the appearance of the alleged real owner, and the pretended lack of knowledge of the name of such purchaser, which could not possibly have been true, either on the part of W. J. Logan, if his bank account was used by his brother to pay for the bonds on his own account, or of M. G. Palliser, who claims to be half owner of the bonds, is alone consistent with this view; and that, first, Bolan, and then Frank J. Logan, the so-called purchasers, were mere dummies, and never in fact and in truth had any real existence as bona fide buyers. Whether this be true or not, certainly Frank J. Logan's alleged acquisition of the property was under such circumstances as to disentitle him or his copartner, Palliser, in equity, to profit and speculate on the misfortunes of this bankrupt company. His purchase is shrouded in too much mystery and doubt. His failure to come forward, as a straightforward man would have done, and explain his action and connection therewith, cannot be lightly brushed aside; and the fact that he was never known or heard of until death had removed the first alleged owner, Bolan, is a powerful circumstance tending to show his delay in appearing in the transaction. The inference is almost irresistible that had Bolan, the first claimant, lived, Logan would never have been heard of. Had Frank J. Logan been the bona fide purchaser of these bonds, involving the no mean sum of $22,500, and out of which he expected to make considerably more than four times that amount, his purchase would have been easily susceptible of proof, as well as the fact of how he secured the money to buy the same, and why the bonds were acquired in his brother's name, charged to his brother's account, and delivered to his brother instead of himself, and, indeed, any and every thing about the transaction; and he would have been more than careful to have produced proper witnesses, and gone upon the stand himself to give a full and complete account of his actings and doings in the premises, and never have risked his case, involving so much to him, upon any such testimony, taken in another case, as he is attempting to do, and without taking any proceeding other than the filing of his petition in the bankruptcy case, and in which he makes the modest request to have the face value of these bonds, with interest, amounting now to upwards of $130,000, turned over to him; nor would there have been any such varying, uncertain, and unnatural performances in the assertion of the claim as Logan's standing aside and Bolan stepping in, then Bolan dropping out and Logan resurrected to make the claim. Neither Logan, Meurer, Ramsey, Palliser, or Hitchings, by reason of their relation to the bankrupt company, could have acquired these bonds at a profit to themselves, and Frank J. Logan, who it is claimed bought the bonds for himself and Palliser, is in no better position than

Palliser would have been himself. Palliser was a director of the company, its secretary and its attorney, and the law will not countenance a transaction on his part whereby he used his information, acquired by him in his fiduciary capacity, to speculate, directly, or indirectly, upon the property of his cestui que trust; and his copartner, the one to whom he, from his own account, afforded the information, is charged with his knowledge, and cannot escape the consequence, of the source from which he acquired the same. It would be unconscionable in the last degree to allow any of the parties in question to profit by a transaction such as the one involved here, or to receive more than they actually paid with interest; and they should be deemed fortunate that a court of equity will even thus far recognize their rights, and afford them relief, in an undertaking of such doubtful and questionable character.

3. Coming to the questions arising on the intervening petitions of the Farmers' Deposit National Bank of Pittsburgh and George C. Sturgiss, we likewise find ourselves unable to concur with the lower court in the view that either the bank or Sturgiss are estopped from appearing, as creditors of the bankrupt company, to assert the debts and enforce the liens set up by their said petition against the Morgantown Tin Plate Company, and the decree dismissing the same should at least have been entered without prejudice, to the end that the bankrupt court in the distribution of the bankrupt's estate could have ascertained and decreed the payment of the said debts in the proper order of their priorities, as will be hereinafter indicated.

It follows from what has been said, and the conclusion of the court upon the three causes heard and submitted together is:

First. That the decree of the Circuit Court in the equity cause appealed from (being No. 780), in so far as it denies to the complainant the Canton Roll & Machine Company, the relief sought, and dismisses its bill, should be reversed at the cost of the defendant the Morgantown Tin Plate Company, which should include as well the costs in this as in the lower court; and that the assignees aforesaid of said complainant should be decreed the amount of its claim, with interest, as a lien against the assets of the bankrupt company, ahead of the bondholders under the general mortgage executed by the company, said lien to be so recognized and enforced in the bankruptcy case in the distribution of the bankrupt's assets; and that said decree should be also reversed in so far as it dismisses unconditionally, instead of without prejudice, the bill and intervening petitions seeking to contest the sale of the bonds of the bankrupt company, deposited as collateral security, and claimed to have been acquired by innocent holders for value, as well as because of the like dismissal of the joint petitions of the Farmers' Deposit National Bank of Pittsburgh and George C. Sturgiss, setting up certain debts against the bankrupt company. Said cause should be retained on the docket until the final distribution of the bankrupt's estate in the bankruptcy proceedings, to the end that the testimony already taken in the equity cause, when needed, may be used in consideration of any particular claim in the bankruptcy case.

Second. That the decree of the District Court appealed from in the

bankruptcy case (being No. 781) should be modified so as to award to the appellee Frank J. Logan the sum of $22,500, with interest at 6 per centum per annum from the 1st day of January, 1903, instead of $100,000, with interest from said date, and that, as modified, said decree should be affirmed with costs to the appellants in said bankruptcy appeal, against the appellee Frank J. Logan, they having substantially prevailed; and that in said bankruptcy case the bankrupt's estate should be duly administered, determining the order of priority of debts as herein provided, that is to say:

(1) Paying to the Canton Roll & Machine Company the amount of its claim, with interest and costs; the costs incurred in the equity cause by the complainant and the bankrupt's trustee, together with the proper costs of administration of the bankrupt's estate, and any unpaid labor, mechanics' and supply claims.

(2) The amount due on the mortgage bonds held by George C. Sturgiss and Frank J. Logan, respectively.

(3) The amount of the claim of the Hooven-Rentschler Company for $13,868.08, with interest, being for the purchase price of certain personal property acquired by the bankrupt company, and sold by the court herein, and for which there was a reservation of title in the vendor, though no lien therefor recorded.

(4) To the general creditors of the bankrupt's estate.

(5) The residue to the stockholders of the bankrupt.

Third. That the petition to superintend and revise in matter of law the decree of the District Court in favor of Frank J. Logan (being No. 762) be dismissed at the cost of the petitioners, the Farmers' Deposit National Bank of Pittsburgh, Pa., and George C. Sturgiss.

And these causes are respectively remanded to the proper lower courts, with directions to proceed therein in accordance with the views herein expressed.